ORIGINAL

## United States District Court
## Central District of California

| UNITED STATES OF AMERICA vs. | Docket No. | CR02-00220-(A)-SJO |
|---|---|---|

**Defendant**   ALTMANIS, Ainar

akas:  unknown

Social Security No. x   x   x   x
(Last 4 digits)

### JUDGMENT AND PROBATION/COMMITMENT ORDER

In the presence of the attorney for the government, the defendant appeared in person on this date.

| | MONTH | DAY | YEAR |
|---|---|---|---|
| | Feb. | 20, | 2008 |

**COUNSEL**  [x] WITH COUNSEL                    Ellen Barry, appointed
                                                    (Name of Counsel)

**PLEA**  [x] GUILTY, and the court being satisfied that there is a factual basis for the plea. [ ] NOLO CONTENDERE  [ ] NOT GUILTY

**FINDING**  There being a finding/verdict of [x] GUILTY, defendant has been convicted as charged of the offense(s) of:
**18 USC § 1203: Conspiracy to take hostages resulting in death as charged in count one of the First Superseding Information; 18 USC § 1203: Hostage-Taking resulting in death as charged in counts two, three, and four of the First Superseding Information.**

**JUDGMENT AND PROB/ COMM ORDER**  The Court asked whether defendant had anything to say why judgment should not be pronounced. Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of:

It is ordered that the defendant shall pay to the United States a special assessment of $400, which is due immediately.

It is ordered that the defendant shall pay restitution in the total amount of $710,245 pursuant to 18 U.S.C. § 3663A.

The amount of restitution ordered shall be paid as follows:

| Victim | Amount |
|---|---|
| George Safiev c/o Konstantinos Tezhik | $ 710,245.00 |

Restitution shall be due during the period of imprisonment, at the rate of not less than $25 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program. If any amount of the restitution remains unpaid after release from custody, nominal monthly payments of at least $50 shall be made during the period of supervised release. These payments shall begin 30 days after the commencement of supervision. Nominal restitution payments are ordered as the court finds that the defendant's economic circumstances do not allow for either immediate or future payment of the amount ordered.

The defendant shall be held jointly and severally liable with co-participants Iouri Mikhel, Jurijus Kadamovas, Petro Krylov, Natalya Solovyeva, and Aleksejus Markovskis  (Docket No. CR02-00220) for the amount of restitution ordered in this judgment.

CR-104 (11/04)                    JUDGMENT & PROBATION/COMMITMENT ORDER                    Page 1 of 4

USA vs.  **ALTMANIS, Ainar**                                    Docket No.:  **CR02-00220-(A)-SJO**

Pursuant to 18 U.S.C. § 3612(f)(3)(A), interest on the restitution ordered is waived because the defendant does not have the ability to pay interest.  Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

The defendant shall comply with General Order No. 01-05.

All fines are waived as it is found that the defendant does not have the ability to pay.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Ainar Altmanis, is hereby committed on counts one, two, three, and four of the First Superseding Information to the custody of the Bureau of Prisons to be imprisoned for a term of 280 months.  This term consists of 280 months imprisonment on each of counts one, two, three and four of the First Superseding Information, to be served concurrently.

If released from imprisonment, the defendant shall be placed on supervised release for a term of five years.  This terms consists of five year on each of counts one, two, three and four of the First Superseding Information, to be served concurrently under the following terms and conditions:

1.  The defendant shall not commit any violation of local, state or federal law or ordinance.

2.  The defendant shall comply with the rules and regulations of the U. S. Probation Office and General Order 318;

3.  During the period of community supervision the defendant shall pay the special assessment and restitution in accordance with this judgment's orders pertaining to such payment;

4.  The defendant shall comply with the immigration rules and regulations of the United States, and if deported from this country, either voluntarily or involuntarily, not reenter the United States illegally.  The defendant is not required to report to the Probation Office while residing outside of the United States; however, within 72 hours of release from any custody or any reentry to the United States during the period of Court-ordered supervision, the defendant shall report for instructions to the United States Probation Office, located at the United States Court House, 312 North Spring Street, Room 600, Los Angeles, California  90012;

5.  The defendant shall cooperate in the collection of a DNA sample from the defendant; and

6.  As directed by the Probation Officer, the defendant shall apply monies received from income tax refunds, lottery winnings, inheritance, judgements and any anticipated or unexpected financial gains to the outstanding court-ordered financial obligation.

The Court will impose the drug testing conditions mandated by statute because of the evidence elicited during the course of the trial that controlled substances were used to sedate certain of the victims.

USA vs.   **ALTMANIS, Ainar**                                      Docket No.:    **CR02-00220-(A)-SJO**

The Court advises the defendant of his right to appeal.

In the interest of justice the Court dismisses any underlying indictment(s).

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed. The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

February 20, 2008                                    S. James Otero
_____                                  _____
Date                                                 U. S. District Judge/Magistrate Judge

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

                                                     Sherri R. Carter, Clerk

February 20, 2008                                    By    Victor Paul Cruz
_____                                  _____
Filed Date                                           Deputy Clerk

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

## STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE

While the defendant is on probation or supervised release pursuant to this judgment:

1.  The defendant shall not commit another Federal, state or local crime;
2.  the defendant shall not leave the judicial district without the written permission of the court or probation officer;
3.  the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
4.  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
5.  the defendant shall support his or her dependents and meet other family responsibilities;
6.  the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
7.  the defendant shall notify the probation officer at least 10 days prior to any change in residence or employment;
8.  the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
9.  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered;
10. the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
11. the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
12. the defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
13. the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
14. as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to conform the defendant's compliance with such notification requirement;
15. the defendant shall, upon release from any period of custody, report to the probation officer within 72 hours;
16. and, for felony cases only: not possess a firearm, destructive device, or any other dangerous weapon.

| x | The defendant will also comply with the following special conditions pursuant to General Order 01-05 (set forth below). |

USA vs.   **ALTMANIS, Ainar**                                         Docket No.:   **CR02-00220-(A)-SJO**

## STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS

The defendant shall pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment pursuant to 18 U.S.C. §3612(f)(1). Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. §3612(g). Interest and penalties pertaining to restitution , however, are not applicable for offenses completed prior to April 24, 1996.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant shall pay the balance as directed by the United States Attorney's Office. 18 U.S.C. §3613.

The defendant shall notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence until all fines, restitution, costs, and special assessments are paid in full. 18 U.S.C. §3612(b)(1)(F).

The defendant shall notify the Court through the Probation Office, and notify the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. §3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution-pursuant to 18 U.S.C. §3664(k). See also 18 U.S.C. §3572(d)(3) and for probation 18 U.S.C. §3563(a)(7).

Payments shall be applied in the following order:

     1. Special assessments pursuant to 18 U.S.C. §3013;
     2. Restitution, in this sequence:
             Private victims (individual and corporate),
             Providers of compensation to private victims,
             The United States as victim;
     3. Fine;
     4. Community restitution, pursuant to 18 U.S.C. §3663(c); and
     5. Other penalties and costs.

## SPECIAL CONDITIONS FOR PROBATION AND SUPERVISED RELEASE

As directed by the Probation Officer, the defendant shall provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant. In addition, the defendant shall not apply for any loan or open any line of credit without prior approval of the Probation Officer.

The defendant shall maintain one personal checking account. All of defendant's income, "monetary gains," or other pecuniary proceeds shall be deposited into this account, which shall be used for payment of all personal expenses. Records of all other bank accounts, including any business accounts, shall be disclosed to the Probation Officer upon request.

The defendant shall not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

USA vs.   **ALTMANIS, Ainar** _____   Docket No.:   **CR02-00220-(A)-SJO**

## RETURN

I have executed the within Judgment and Commitment as follows:

Defendant delivered on _____ to _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal determined on _____

Defendant delivered on _____ to _____

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

By _____

_____  
Date

Deputy Marshal

## CERTIFICATE

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

By _____

_____  
Filed Date

Deputy Clerk

## FOR U.S. PROBATION OFFICE USE ONLY

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) _____

Defendant

_____  
Date

_____  
U. S. Probation Officer/Designated Witness

_____  
Date

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR 02-220(A)-SJO |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| AINAR ALTMANIS, | ) | Wednesday, February 20, 2008 |
| | ) | (1:39 p.m. to 2:35 p.m.) |
| Defendant. | ) | |

SENTENCING RE GUILTY PLEA COUNTS ONE THROUGH FOUR
OF THE FIRST SUPERSEDING INDICTMENT

BEFORE THE HONORABLE S. JAMES OTERO,
UNITED STATES DISTRICT JUDGE

Appearances:    (See next page)

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

**APPEARANCES FOR:**


Plaintiff:                          GEORGE S. CARDONA, ESQ
                                    Acting United States Attorney
                                    THOMAS P. O'BRIEN, ESQ
                                    Assistant United States Attorney
                                    Chief, Criminal Division
                                    SUSAN J. DEWITT, ESQ
                                    ROBERT E. DUGDALE, ESQ
                                    KIM MEYER, ESQ
                                    Assistant United States Attorney
                                    312 North Spring Street
                                    Los Angeles, CA 90012

Also present:                       Special Agent Louis Perez
                                    Special Agent James Davidson

Defendant:                          ELLEN M. BARRY, ESQ
                                    Ellen M. Barry Law Offices
                                    316 W. 2nd St., Suite 1202
                                    Los Angeles, CA 90012

Interpreters:                       Ludmilla Genn
                                    Alex J. Levoff

Deputy Clerk:                       Victor P. Cruz

Law Clerks:                         Tony Lopez
                                    Andrew Gloger

Court Recorder:                     Margarita Lopez

Transcribed by:                     Exceptional Reporting Services, Inc.
                                    14493 S. Padre Island Drive
                                    Suite A-400
                                    Corpus Christi, TX 78418-5940
                                    361 949-2988

3

1          <u>Los Angeles, CA; Wednesday, February 20, 2008; 1:39 p.m.</u>

2                    <u>(Interpreter Utilized for Translation)</u>

3                              (Call to Order)

4          THE COURT:  This is Item Number 2, Case Number

5    CR 02-220(B)-SJO, *The United States of America versus Ainar*

6    *Altmanis.*

7          Counsel, would you please state your appearances.

8          MR. DUGDALE:  Good afternoon, your Honor.  Robert

9    Dugdale, Susan DeWitt and Kim Meyer from the United States of

10   America.  Also present at counsel table are Special Agents

11   Louis Perez and James Davidson of the Federal Bureau of

12   Investigation.

13         MS. BARRY:  Good afternoon, your Honor.  Ellen Barry

14   on behalf of Ainar Altmanis, who is present.

15         THE COURT:  Good afternoon.  Please have a seat.

16         We're here for the sentencing of Mr. Altmanis.  I

17   just want to make sure that Mr. Altmanis is utilizing the

18   services of a Russian interpreter.  Mr. Altmanis, would you

19   place the headset on.  Thank you.

20         The sentencing will go forward today with the

21   Defendant seated at counsel table, along with counsel.  And

22   we're making sure that the headset is working.  Mr. Altmanis,

23   when it works, please let us know.

24         (Pause)

25         Just to place in context, at the sentencing today

4

1   there was a long sentencing hearing this morning regarding

2   Ms. Solovyeva.   The Court would incorporate its comments placed

3   on the record this morning in reference to the sentencing of

4   this Defendant.   We'll start with a review of the documents.

5   The Court had reviewed various documents and pleadings in

6   preparation for today's proceeding.

7            Again, the Court reviewed the Plea Agreement filed

8   back on or about June 7th, 2002.   Of particular import to the

9   Plea Agreement are the stipulation or the factual stipulation

10  contained and attached to the Plea Agreement, which the Court

11  has considered.

12           The Court has, of course, reviewed the Presentence

13  Investigation Report.   The PSR -- I'm looking for the date of

14  disclosure on the PSR.   My copy is without a date.   Let me ask

15  counsel for Mr. Altmanis.

16           The date of disclosure, could you provide that?

17           **MS. BARRY:**   I don't actually know, your Honor, but I

18  know it's more than the statutorily mandated time period.

19           **THE COURT:**   We have the --

20           **MS. BARRY:**   We've had it for several months.

21           **THE COURT:**   We have the probation officer --

22           **MR. DUGDALE:**   Your Honor, I believe it was in

23  September of last year, your Honor.

24           **THE COURT:**   Okay.   We have the probation officer in

25  court, so we'll just check with the probation officer.   Thank

5

1    you.

2         **(Pause / Court confers off the record)**

3              It looks like it was reviewed by the supervisor for

4    the Probation Officer Foster on or about 10-16-06.

5              Mr. Altmanis, were you given a copy of the -- were

6    you provided access to the Presentence Investigation Report on

7    or about October of '06?

8              **MS. BARRY:**  Your Honor, speaking for Mr. Altmanis,

9    I've had some difficulty arranging the visitation with

10   Mr. Altmanis.  I spoke with him in person and reviewed the

11   Presentence Report with him in person over a month ago.  There

12   is some difficulty in having the Presentence Report at the

13   place where he is.

14             **THE COURT:**  I'm sorry.  I couldn't hear you.

15             **MS. BARRY:**  There's some difficulty with respect to

16   the institution in having him be in possession of the

17   Presentence Report itself.  But we spent hours reviewing the

18   contents of it.

19             **THE COURT:**  Okay.  Well, Mr. Altmanis, were you given

20   the opportunity to review the contents of the Presentence

21   Investigation Report with the disclosure date in October of

22   '06?

23             **THE DEFENDANT:**  Yes.

24             **THE COURT:**  And was the report translated for you

25   from English into Russian?

6

1          THE DEFENDANT:  Yes.

2          THE COURT:  And did you have the ability to discuss

3    the contents of the report with your counsel?

4          THE DEFENDANT:  Yes.

5          THE COURT:  And did that discussion take place with a

6    Russian interpreter assisting you?

7          THE DEFENDANT:  No.

8          THE COURT:  Counsel, when you had discussions with

9    your client, did you utilize the services of a Russian

10   interpreter?

11         MS. BARRY:  On some occasions I did, your Honor.  On

12   other occasions I did not.  At the time that the Presentence

13   Report -- that we were discussing it, no, I did not.  He

14   preferred to speak to me in English.

15         THE COURT:  Okay.  And did you feel comfortable that

16   he was able to understand your conversation?

17         MS. BARRY:  Yes, your Honor.

18         THE COURT:  And do you feel comfortable with his

19   ability to understand the contents of the Presentence

20   Investigation Report?

21         MS. BARRY:  Yes, your Honor.  Your Honor, I'm not

22   sure whether the Court wants me to rise when I'm addressing the

23   Court or whether it wants me to remain seated, which is why --

24         THE COURT:  Please stand.

25         MS. BARRY:  Thank you.

7

1          **THE COURT:**   Yes?

2          **MS. BARRY:**   Yes, your Honor.

3          **THE COURT:**   Okay.   Mr. Altmanis, you discussed the

4    contents of the Presentence Investigation Report without a

5    Russian interpreter.

6          Were you able to understand what your attorney

7    advised you in reference to the contents of the Presentence

8    Investigation Report?

9          **THE DEFENDANT:**   Yes, perfectly.

10         **THE COURT:**   Thank you.   The Court has reviewed the

11   confidential letter recommendation to the Court from the

12   probation officer, Mr. Young, who is present in court.   And I

13   should place on the record that I met with the probation

14   officer before the start of this afternoon's proceedings.   The

15   confidential letter recommendation is without the benefit of

16   the Government's 5K motion.   Pursuant to statute the

17   recommendation is life without the possibility of release.

18         The Court has reviewed the Government's position

19   pleading filed on or about November 20th, '07.   The Government

20   concurs with the findings and conclusions in the Presentence

21   Investigation Report.   The Government believes that the total

22   offense level is 44, which is one level higher than the highest

23   offense level in the Sentencing Guideline.

24         The Government also believes that the probation

25   officer has correctly calculated the Criminal History Category,

8

1   which is I.   The Government believes pursuant to 5K that the

2   Court should depart downward six levels from a 44 to an offense

3   level 38.   That would place the Defendant within the guideline

4   range of 235 to 293 months.   The Government believes that a

5   sentence of 240 months is the appropriate sentence in this

6   case.

7           The Court has also received a letter submitted in

8   connection with the sentencing of Mr. Altmanis that was

9   previously offered in reference to Ms. Solovyeva.   I just was

10  given a copy of the letter today, but I assume it's the same

11  letter that was offered in reference to Ms. Solovyeva; is that

12  correct?

13          MR. DUGDALE:   It is identical, your Honor.   Thank

14  you.

15          THE COURT:   Thank you.   Which the Court has

16  referenced this morning and carefully considered.

17          And the Court has reviewed the sentencing position

18  provided by counsel for the Defendant.   The Defendant concurs

19  with the findings and conclusions in the Presentence

20  Investigation Report and the calculations.   The Defendant

21  believes or counsel for the Defendant believes that a sentence

22  of 15 years is the appropriate sentence in the case.

23          Again, we start with the Presentence Investigation

24  Report.   There was much discussion this morning regarding the

25  facts and circumstances surrounding the murders of the five

1    victims.  I'm not going to repeat everything that was mentioned

2    this morning.

3          The record should reflect that the Defendant,

4    Mr. Altmanis, pled guilty to Counts One through Four of the

5    Indictment.  Count One charged the violation of Title 18,

6    U.S. Code, Section 1203, alleging during the period ending on

7    February 19 in Los Angeles County, Mr. Altmanis conspired with

8    others to seize and detain another person, resulting in the

9    death of a victim, in violation of Title 18, 1203, and hostage

10   taking resulting in death.  Specifically identified as victims

11   were -- that were seized, detained and murdered were

12   Mr. Umansky, Ms. Pekler, Mr. Kharabadze and Mr. Safiev.

13         Count Two charged a violation of Title 18, 1203,

14   involving Mr. Umansky, detention and holding for ransom

15   involving the death of Mr. Umansky.

16         Count Four, same offense -- I'm sorry -- Count Three,

17   same offense involving Mr. Kharabadze.

18         Count Four, same offense, Title 18, USC 1203,

19   involving Mr. Safiev.

20         The Court has carefully reviewed the offense conduct.

21   Of particular import in reference to Mr. Altmanis is that

22   Mr. Altmanis participated in the murders of all the victims in

23   that he admitted to actually taking part in the physical

24   killing of Mr. Umansky and also Mr. Kharabadze by either

25   suffocating or strangling those two victims.

10

1          The Court has reviewed the other portions of the

2   Presentence Investigation Report.  Mr. Altmanis has accepted

3   responsibility.  The Court would adopt the findings and

4   conclusions on Page 15 that the total offense level after

5   adjustments would be 44.  As pointed out by the Government,

6   that's one level higher than the 43 level in the guidelines.

7          The Court has reviewed his criminal history.  He has

8   one conviction, and that's for this, in state court.  No other

9   convictions.

10         The Defendant has, apparently, resided in the United

11  States since I believe 1991.  He arrived in the United States

12  illegally and has been residing in the United States illegally

13  since.

14         The Court has reviewed his financial condition.  At

15  the time that the Search Warrant was executed on his home he

16  was found with $110,000 in cash.  And the Defendant would not,

17  however, have the ability to pay a fine.

18         The Court has reviewed the sentencing options.  The

19  statute provides for life without the possibility of release

20  unless there's a 5K motion.  The Court has carefully considered

21  the 5K motion and the Government's position regarding

22  sentencing.

23         Does the Government have anything else to offer?

24         **MR. DUGDALE:**  Yes, your Honor.  I'm going to try not

25  to belabor a lot of the points in our lengthy --

1            **THE COURT:**  Yes.

2            **MR. DUGDALE:**  -- sentencing position paper in moving

3 along with it.  But I want to make a couple of things clear.

4            First of all, our recommendation is based really

5 solely on one fact, and that is the extraordinary cooperation

6 of Mr. Altmanis.  Absent that cooperation, say, Mr. Krylov had

7 been the person to come forward, you know, the Government would

8 be arguing in Mr. Altmanis' case for exactly the same type of

9 justice that Mr. Krylov, Mr. Mikhel and Mr. Kadamovas

10 experienced in this case.

11            But the fact of the matter is that none of those

12 people came forward even after Mr. Altmanis cooperated.  And

13 Mr. Altmanis was really at the most important time in the case

14 the first one to step up to cooperate with the Government.

15            So at the same time, I don't think you can over-

16 estimate how heinous the crimes he committed were, and they

17 clearly were.  The Court's likely not to see crimes more

18 serious than the crimes the Court heard about during this

19 trial.  He did an incredible amount of damage to the victims in

20 this case, and he did the types of things that demand the most

21 serious of punishment.

22            But at the same time, it's impossible to overstate

23 the nature and the helpfulness of his cooperation.  To do so I

24 think the best way to look at it is to take us back to where we

25 were almost six years ago to the day.  The Defendants were

12

1   arrested.  Mr. Altmanis was arrested and put in state custody

2   on February 19th.  Mr. Krylov, Mr. Mikhel and Mr. Kadamovas

3   were put into federal custody.

4           At that time on February 19th, we did not even have

5   probable cause to arrest Mr. Altmanis on the crimes to which he

6   ultimately pled guilty.  At that time, six years ago from

7   today, we had substantial holes in the case as related to the

8   victims.  We didn't know whether they were alive or dead.  We,

9   of course, feared the worst at the time, but there was no

10  certainty as to whether the victims were even alive or dead.

11  We didn't know how they were killed, we didn't know where their

12  bodies were, we didn't even know how many victims we could

13  attribute to this horrible organization that got together and

14  did these crimes.

15          As far as the participants in these crimes, again,

16  Mr. Altmanis was sitting in state custody.  We lacked probable

17  cause to charge him, at least on February 19th, with the crimes

18  to which he pled guilty.  We didn't have Mr. Markovskis on the

19  radar at all.  Ms. Solovyeva we didn't have probable cause to

20  charge with anything.

21          And at the time Mr. Mikhel, Mr. Kadamovas and

22  Mr. Krylov were sitting in federal custody on a warrant for,

23  basically, handling ransom money, which is what we had at the

24  time of their arrest.  And certainly the case improved based

25  upon what we found at the various locations.  And should

13

1   Mr. Altmanis have any doubt as to whether he made the right

2   decision or not, of course, we found Mr. Umansky's equipment

3   from his car.  We were able to trace ransom money to

4   Mr. Altmanis.

5           So at the end of the day I believe we would have been

6   able to build a case against Mr. Altmanis, but there would have

7   been holes.  There was no way that we would have found the

8   victims in this case absent Mr. Altmanis' cooperation.  Those

9   victims would still be sitting 300 feet under water with

10  weights attached to them.  There is no way we would have

11  learned about how these victims died.  Their family members

12  never would have been able to give them a proper burial.  We

13  never would have been able to explain to the families how their

14  loved ones died.

15          The Muscatel family probably would have been in the

16  worst position of all.  As of February of 2002, his body had

17  been recovered months earlier.  His bones were literally

18  sitting in a box with the Sheriff's Department at that time.

19  They had done everything they could possibly think of to try

20  and even identify him, and they had not even gotten to that

21  step.  So there was no inkling that he was connected at all to

22  what had happened here.  So had Mr. Altmanis not stepped

23  forward and made that connection, showed us where the bodies

24  were, the Muscatel family would still be without a clue as to

25  what happened to Muscatel, and his body would still be sitting

14

1    in that box.   There is little doubt as to that fact.

2         In addition, as I mentioned, Mr. Markovskis'

3    involvement in this case probably would have gone undetected

4    and unpunished.   Ms. Solovyeva, likely, would be in the same

5    position.   We wouldn't have had information linking the

6    Defendants to the murders that they committed overseas, as

7    well.   Mr. Altmanis helped make that connection, as well.

8         Some of the best evidence that the Government

9    ultimately came up with tying the Defendants to the crime,

10   again, was a result of Mr. Altmanis' cooperation.   The weight,

11   we pointed out in the Papers, that was seized from Mr. Krylov's

12   apartment, without knowing where the bodies were and that there

13   were weights attached to the bodies and how they were disposed

14   of, that information, obviously, wouldn't have really had any

15   import to us at the time.

16        The DNA from the victims we would not have recovered

17   without the bodies; and, therefore, we wouldn't have made the

18   link to the DNA found on the handcuffs found at Mr. Mikhel's

19   place.

20        Once the Government knew that the bodies had been

21   disposed of at the bridge, there was a whole avenue of new

22   evidence that opened up.   We were able to track through cell

23   site records Mr. Mikhel and Mr. Kadamovas moving up to the

24   bridge on the dates in question.   We were able to get

25   photographs that showed a bloody footprint on the Parrot's

15

1    Ferry Bridge that we were able to match to a pair of shoes that

2    we seized at Mr. Kadamovas' place.

3         We were able to go back to Home Depot and found out

4    that right before Mr. Muscatel's murder, Mr. Mikhel using a

5    credit card purchased flex ties and masking tape just like the

6    kind of flex ties and masking tape found on Mr. Muscatel.

7         But again, all of this doesn't come to light without

8    Mr. Altmanis stepping forward and providing the information

9    that he did.  So without that, without that cooperation, it's

10   difficult to see how the Government could have achieved the

11   results that it did in this case.

12        Again, I am confident that given what the FBI was

13   able to develop after the searches and things of that nature,

14   we would have been able to link Mr. Altmanis, Mr. Mikhel,

15   Mr. Krylov and Mr. Kadamovas to the disappearance of these

16   people, albeit without their bodies and everything else.  It's

17   hard to believe we would have gotten the death penalty against

18   anybody in the case and certainly not Mr. Altmanis.

19        So our position in this case, your Honor, is that

20   Mr. Altmanis -- it's not fair to put Mr. Altmanis in the same

21   position that he would have been in under a worst case scenario

22   right now than if he had never opened his mouth at all.  If he

23   had never opened his mouth at all, the worst scenario I see for

24   Mr. Altmanis is that he spend the rest of his life in custody

25   without the possibility for release.

16

1          So that is why the Government is recommending the

2     departure that it has.  And sort of using the same methodology

3     that the Court has used in some of the -- in the other

4     sentencings, after a 20-year sentence, assuming Mr. Altmanis

5     gets his good time, he will be released when he's just over

6     60 years old, I believe.

7          The Court has cited actuarial tables in connection

8     with Mr. Markovskis' sentencing citing that, I believe the

9     average male lives to about 79 years old.  I don't think you'll

10    be able to find an actuary, however, that would come in and say

11    that a person who spent almost two-thirds of his life in Latvia

12    and has spent 20 years in federal custody is going to make it

13    to that age.  I don't think that's a good bet for Mr. Altmanis,

14    frankly, especially considering health problems that he has and

15    the fact that he abused alcohol in a horrible way, again all

16    his fault, prior to at some point in his youth.

17         I, in fact, looked this up after the sentencing

18    today, and the World Health Organization did a study on

19    longevity for people who are born in Latvia.  And what they

20    have concluded is that a male born in Latvia in 2002, the

21    average life expectancy for a male is 65.7 years, a sort of

22    shocking difference between the United States and Latvia.  But

23    that's -- in fact, it drags behind almost every other country

24    in Europe.  It's ten years behind the average in Europe.

25         So giving the Defendant the opportunity to live some

17

1    sort of productive life outside of custody is what the

2    Government believes that this Defendant earned as a result of

3    his extraordinary cooperation.  And again, we think that's a

4    fair result, particularly when you take into account the issues

5    that were raised in the letter that was offered by the FBI and

6    put forward to the Court and which was discussed at length in

7    Ms. Solovyeva's sentencing today.

8            In 20 years, especially given the conditions that

9    Mr. Altmanis is going to live in, is not going to be an easy

10   sentence.  I'm not going to discuss those conditions

11   specifically here.  But I'll tell you that over the past six

12   years he has lived a very lonely and solitary life by necessity

13   because he -- of course, by cooperating he placed himself in

14   extreme danger.  But he has no family.  He's, basically, with

15   the exception of his brother, has been cut off by his family.

16   He has seen his children a handful of times since he's been in

17   custody for the past six years.  And because of the

18   requirements that keep Mr. Altmanis safe, he is going to live a

19   very solitary and lonely life while he is in custody.  I hate

20   to break that to Mr. Altmanis, and I'm sure he knows that fact

21   is true.

22           But Mr. Mikhel and Mr. Kadamovas and Mr. Krylov,

23   frankly, are having a party in comparison to him.  Obviously,

24   they have a different end result with them, but their terms of

25   confinement are much, much different.

18

1          So given the nature of that confinement, given the

2   extraordinary cooperation that he provided and all the other

3   factors I've mentioned, I would submit that a 240-month

4   sentence is a fair sentence, which both doesn't minimize or

5   trivialize the extreme harm this Defendant did and the extreme

6   actions that he took, but takes into account fully the nature

7   of the cooperation that he provided.

8          So unless the Court has any questions, I would submit

9   on that.

10          THE COURT:  I have a couple of questions.  First of

11   all, well stated.  I thought that was a very well stated

12   argument on behalf of the Government.  I do agree that he was

13   the most valuable of all of the persons who cooperated.  Let me

14   ask you some questions.

15          One of the factors enunciated in 3553 is to protect

16   the public from further crimes from the Defendant and to afford

17   adequate deterrence to criminal conduct.  Mr. Altmanis has

18   admitted to participating in the murders of five victims,

19   personally strangling two with his hands.  Trend analysis.  You

20   look at the past to predict the future.

21          MR. DUGDALE:  I understand the Court's point.  I'm

22   sorry.

23          THE COURT:  The concern is protection of the

24   community.

25          MR. DUGDALE:  Of course.  As the Court should note,

EXCEPTIONAL REPORTING SERVICES, INC

19

1    however -- and again, I'm not here to defend Mr. Altmanis and

2    I'm sure his counsel will --

3              THE COURT:  No.

4              MR. DUGDALE:  -- address this probably more fully.

5    But there was no evidence that Mr. Altmanis engaged in acts of

6    violence prior to meeting Mr. Mikhel and Mr. Kadamovas.  I know

7    the argument has been made that he was subservient to them and

8    everything else.  There's no question that they were the

9    ringleaders here.

10             But independently it does appear that Mr. Altmanis

11   was sort of a -- I can't say a thief on a small scale because

12   he had $100,000 sitting under his sink in his kitchen.  He was

13   moving a lot of stolen goods.  There's no question about that.

14   He was a thief, he was a con man, there was no question about

15   that at all.  But there is no evidence to suggest that he was

16   engaged in this type of activity until he became involved with

17   Mr. Mikhel and Mr. Kadamovas.

18             And as the Court saw, even with Markovskis, even sort

19   of the best and the broadest, I'm not putting Mr. Altmanis

20   necessarily in this category.  You know, when they got involved

21   with these Defendants they engaged in horrific activity.

22             THE COURT:  Well, let me --

23             MR. DUGDALE:  So as far as the trend analysis is

24   concerned, unless he runs into another Mikhel and Kadamovas,

25   you can't state the future with certainty.  But that appears to

1  be the triggering moment where this happened.

2          In addition, obviously, him being out at 60 is

3  different than him being out in his early 40's, which was when

4  this activity took place here, too.  And you would think that

5  there would be a message that would be sent after spending

6  20 years in custody that this type of activity if he repeated

7  it that you really forfeit any chance to ever see the light of

8  day again.

9          THE COURT:  Let me just make a couple of

10  observations.  As you know, I spent several years on the state

11  courts.  And in one year I tried seven murder cases to --

12  murder one to a verdict, plus a three-defendant capital case in

13  one year.  I learned very quickly that you don't graduate from

14  being a waiter one day to murder the next day.

15          I understand he doesn't have a prior criminal record.

16  He participated in five murders, strangling two physically.

17  The type of person you have to be in order to physically put

18  your hands on someone and squeeze the life out of them is a

19  person very different from everyone in this room.

20          MR. DUGDALE:  I understand that and agree with that,

21  your Honor.

22          THE COURT:  And in terms of recidivism, at age 60 I'm

23  not sure he's not going to be significant danger to the public,

24  period.  And that has to be a concern that the Court has.

25          MR. DUGDALE:  Just one other point on that fact.

```
1   Given his situation, if he shows his face in public in the

2   Russian community, Mr. Altmanis is very -- quite possibly a

3   dead man.  His ability to link up with people and to do these

4   types of things is really severely limited by the fact that

5   it's well known that he is, basically, a rat.

6             THE COURT:  Well, I suspect that --

7             MR. DUGDALE:  I mean we --

8             THE COURT:  -- if he's released he will not have the

9   same identity.

10            MR. DUGDALE:  That is true.  But what I'm saying

11  is -- and we have had experience with this with our Mexican

12  Mafia Defendants, for instance, who I have worked extensively

13  on prosecuting -- they don't have anywhere to turn when they

14  get out.  They can't go back to the gang life because it's a

15  death sentence to them, because their cooperation is known;

16  they're on a green-light list.  It's sort of the same situation

17  here for Mr. Altmanis.

18            Again, I've spent many, many hours with Mr. Altmanis.

19  You know, because of that maybe it disqualifies me from being

20  sort of objective on this.  But I haven't seen any indication

21  from him that that's what the future holds for him, your Honor.

22  I understand the Court's point about the graduation process,

23  and I agree with that completely.

24            At the same time, we don't have any evidence to

25  support specific acts of violence that he committed.  And it's
```

1   difficult to believe with two other cooperators who came in

2   here and had any and every incentive to try and work down their

3   deals, that they would have left that out of any statement that

4   they had.  So if it was out there, we probably could have

5   learned about it.  Somebody would have come forward and nobody

6   ever has to suggest that Mr. Altmanis was doing this type of

7   stuff, certainly killing people before this happened.

8           **THE COURT:**  Well, he spent most of his years in

9   another country.

10          **MR. DUGDALE:**  That's correct.

11          **THE COURT:**  Okay.  Thank you very much.

12          **MR. DUGDALE:**  Thank you, your Honor.

13          **THE COURT:**  I appreciate it.

14          Counsel for Defendant?

15          **MS. BARRY:**  Your Honor, first of all, I'd like to

16  clarify what I think may be a misunderstanding by the Court

17  with respect to Mr. Altmanis' participation in the murders of

18  Mr. Umansky and Mr. Kharabadze.

19          I spent days with Mr. Altmanis while he was

20  debriefing to both the federal government and the state.  And

21  each time he was consistent about his participation and what he

22  did with respect to each murder.  Each time he never minimized

23  what it was that he did.

24          But the Court seems to be of the opinion that

25  Mr. Altmanis is the person who strangled both of those

23

1  individuals, and he was not.  Even the Presentence Report

2  clarifies that.  If the Court will look at Paragraphs 31

3  and 45, 31 refers to Umansky.

4          What was going on when Mr. Mikhel strangled

5  Mr. Umansky is that he was having difficulty actually killing

6  him by putting a plastic bag over his head.  He then put a rope

7  around his neck and asked Mr. Altmanis to hold one end of the

8  length of rope.

9          Now, I know that this Court did not sit through the

10 first trial of Mr. Mikhel and Mr. Kadamovas.  But Mr. Altmanis

11 was clear with respect to what it was that he did and how he

12 felt when that was going on.  He was reluctant to hold the end

13 of the rope and, in fact, the rope slipped out of his hands

14 because he was not gripping it hard enough for Mr. Mikhel.

15 That is quite different than putting your hands around

16 someone's neck and strangling the life out of him.

17         Second, with respect to Mr. Kadamovas -- excuse me --

18 with respect to Mr. Kharabadze, if you look at Paragraph 45 --

19 and keeping in mind, your Honor, that what the probation

20 officer has included in this report is necessarily a summary of

21 what it was that Mr. Altmanis testified to at two trials and

22 what he told the Government and the DA's Office over and over

23 with respect to what he did and never wavered.

24         What happened with Mr. Kharabadze was that he was

25 strangled in a vehicle and, again, Mr. Mikhel was having

24

1   difficulty strangling Mr. Kharabadze, who was a young man.

2   Mr. Altmanis held onto Mr. Kharabadze's feet is what he

3   testified to.

4          In the Presentence Report it indicates that

5   Mr. Mikhel asked Mr. Altmanis to help hold the bag as he was

6   strangling Mr. Kharabadze.  I should have picked that up, your

7   Honor.  That's not my recollection of what Mr. Altmanis

8   testified to, and I don't know where it comes from.

9          So, yes, he participated in the killing of five

10  individuals.  He was not the actor, the main actor, in these

11  killings.

12         THE COURT:  I agree he's less culpable than

13  Mr. Mikhel and Mr. Kadamovas but probably more involved than

14  Mr. Krylov.

15         Go ahead.

16         MS. BARRY:  With respect to the actual killing.

17         I think the thing that the Court should consider in

18  determining what an appropriate sentence is in this case when

19  the Government speaks of Mr. Altmanis' cooperation is this:

20         When the Court considers what a person has done and

21  is seeking to punish them for their conduct, one of the most

22  important considerations is whether or not that person has

23  demonstrated remorse.  I can't think of circumstances under

24  which there could have been more remorse demonstrated than by

25  what Mr. Altmanis did.  As soon as he was able to do it, he

25

1  reached out to the FBI and he said to them, "I have to tell you

2  about some killings.  I have to talk about this."

3           Not only did he do that, not only did he sit for days

4  being debriefed, but he went with the FBI -- and I accompanied

5  him, your Honor -- on a drive and a flight from here to

6  Sacramento and a drive from Sacramento to the bridges.  Because

7  Mr. Altmanis couldn't remember with respect to route numbers

8  where it was that the bridges that he described to the FBI

9  were.  But he volunteered to go and to show them the route as

10 he recalled it.

11          And during the course of that route, your Honor,

12 Mr. Altmanis became very distressed because he got lost.  And

13 he knew how important it was to the FBI that the bodies were

14 recovered.  But even more so he knew that it was important to

15 him.  That is part of the demonstration of remorse.  It's not

16 just telling on yourself and it's not just telling on other

17 people.  It's doing everything you can that is within your

18 power to show how terrible you feel that you participated in

19 something that was heinous and to try to make it better, to try

20 to help capture the people who were involved to insure that

21 they are never able to do this again.  And that's what

22 Mr. Altmanis did.  That's what the Government is talking about

23 when they talk about cooperation.  And that's why cooperation

24 is rewarded.

25          But let's talk about cooperation a little bit.  As

26

1   this Court is, I am sure, aware, other people who have come

2   before it and who have cooperated in cases have done so with a

3   calculated eye towards reducing their own sentences for their

4   own criminal conduct, whether it is to convince the Court that

5   they're not as big a drug dealer as someone else or whether it

6   is to convince the Court that they're not as violent as the

7   next person.   That is not the conduct that Mr. Altmanis

8   demonstrated in cooperating with the Government.

9          In my experience in this jurisdiction, your Honor,

10  the cooperation has always come about after the Defendant is

11  charged or indicted in a case and after it is made clear to the

12  Defendant that his alternatives are either take a long sentence

13  after a trial or a plea or do something to reduce your own

14  exposure.   That's what cooperation typically is in cases.

15  That's not what Mr. Altmanis did.

16         Mr. Altmanis has no way to repair the damage that he

17  has done except to demonstrate his remorse in the way that he

18  has done it.   An apology is not going to repair that.   All the

19  time that he spends in a cell by himself is not going to repair

20  that.   The loss of his family and the loss of any expectation

21  that he has for the future is not going to repair that.

22         On a deeper and more intimately philosophical level,

23  your Honor, remorse and the demonstration of remorse is the

24  only thing that he can do, and that's what he did and that's

25  what the Court should consider in sentencing him.

27

1          THE COURT:  Anything further?

2          MS. BARRY:  No, your Honor.

3          THE COURT:  Thank you.

4          Mr. Altmanis, do you wish to make a statement?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Okay.  Would you do that at the lectern,

7     please.

8          THE DEFENDANT:  First I want to apologize to the

9     victims' families.

10         (Discussion held off the record with Interpreter)

11         THE COURT:  We're going to need this translated.

12         THE DEFENDANT:  I would like to apologize to you.

13    And then there's nothing that would repair what I have done.

14    Because it will be impossible to turn the things back.  I

15    understand that my words will bring you more grief and I cannot

16    say that I apologize for what I have done.  And they could not

17    apologize because they didn't have enough willpower.  I

18    understand that nothing will bring back your loved ones.  And I

19    did everything possible I could to make it easier for you.  I

20    regret what has happened.

21         As I said during the trial, those people spent most

22    of the time with me because I prepared food for them the way

23    they wanted it.  But I was not allowed to communicate with them

24    as much as I wanted.  But I tried to do my best.  Because this

25    is how it happened.  I got totally confused in this life.  Even

1   if I could have given my life to bring them back, I would have

2   done it.  Because the life of the person that I have become I

3   don't want it.

4        **(Pause)**

5            Please forgive me.

6            **THE COURT:**  Do you have any other statements to make,

7   Mr. Altmanis?

8        **(Defendant continues in English)**

9            **THE DEFENDANT:**  Yeah.  I want to speak to you, your

10  Honor.  Please forgive me for my English.  It's not so very

11  good.

12           I am not going to try to justify all the terrible

13  things I have done.  Nothing can ever justify what I did.  I

14  know that I hurt a lot of people other than the victims.  For

15  the first time in my life I have had time to think and the

16  first time in my life I think what my actions do to others, and

17  I feel ashamed that I am a part of the --

18       **(Defendant becomes emotional)**

19           I want to apologize to the victims' families if

20  possible and for all the hurt I caused them to their children

21  who have to go through life without their dads and moms.  I am

22  so sorry.

23       **(Pause)**

24           I know there is no way I can change anything nor I

25  can return anybody back to life.  If it could be that so your

1  dad or mom could be alive, I would pray for that.

2          Being here I have a lot of time to think over my life

3  and why I ended this way.  I found out that when I come to the

4  United States I come without no financial, no relatives, no

5  friends here and what I thought was a legal way to make money

6  and not a minimum wage.  I stayed in the Russian community,

7  which was another mistake, a bigger mistake.  I come and I made

8  wrong decisions and made wrong choice of friends, (***) of

9  making money make me blind.  And I never was hip deep until I

10 was sinking in the swamp.

11          After six long years in prison I see and learn many

12 ways and opportunities to make legal money in this country

13 besides the make of criminal way.  Because all this time I

14 spent to learn how it was possible my English level on this

15 great and (***) country and the country's (***), the people who

16 live in this country of this type and ways and what they learn

17 from the newspapers, magazines, TVs.  And all this give me

18 power to change myself and be a better person, be a good person

19 in the future if it's possible.

20          Now I can read a little bit and a better

21 understanding of what's going on in this country.  There are

22 many things I am anxious to do in my life if that be possible

23 in the future.  I just want a simple and quiet life, nothing

24 else.

25          I'm glad that your Honor give me this chance to talk

1    and the Government give me a chance to have the beginning and

2    they give me opportunity, hope in the future for myself.  Your

3    Honor, I'm a different person right now, and the people who was

4    with me the six years they're still like a family.  We work

5    together and I'm a different person in all ways.  And that I

6    feel like all my life was just wasting time.  I hurt many

7    people lives and I hurt my family lives, too, and other people

8    lives.

9         **(Pause)**

10             And I ask everybody in this room who have (***) for

11   the victims' family (***) and the prosecutor, I ask you to

12   forgive me and to help me to be a more better person in this

13   world.

14             Thank you, your Honor.

15             **THE COURT:**  Anything further?

16             **MS. BARRY:**  No, your Honor.

17             **THE COURT:**  Thank you.  Would you please have a seat,

18   Mr. Altmanis.

19             And is there anyone on behalf of the victims who

20   wishes to speak, family members?

21             **MR. UMANSKY:**  I will, your Honor.

22             **THE COURT:**  Mr. Umansky?

23             **MR. UMANSKY:**  Yes, sir.

24             **THE COURT:**  Go ahead.

25             **MR. UMANSKY:**  Maybe it will be hard to go on to talk,

1    but I'll try to talk a bit.

2          Me and my family do not accept anything he said and

3    do not believe the rest of the victims' family will not accept

4    it, too.  This man for money be freed tomorrow will start doing

5    the same.  For money he did from the beginning everything.  He

6    sold stolen property.  He killed people.  He, too, tied the

7    rope around the neck of my son and he already have to be

8    probably the same way with Mikhel and Kadamovas.  But he start

9    talking help from the Government and he spared his life.  That

10   doesn't mean he spared his life he have to go free in 20 years.

11         He participated all killings freely, freely; accept

12   money for that.  This man should suffer more than my son and my

13   family.  He should stay in prison for the rest of his life

14   because it's a kind of a people.  I know them.  I am from the

15   same country especially he is from, Lithuania.  Tomorrow on the

16   street he will start doing for money the same thing, exactly

17   the same thing.

18         Thank you.

19         THE COURT:  Thank you, sir.

20         Is there anything further?  Nothing from the

21   Government?

22         MR. DUGDALE:  No, your Honor.  Thank you.

23         MS. BARRY:  No, your Honor.

24         THE COURT:  The Court would just make two comments.

25   One is in terms of Mr. Altmanis' cooperation.  In the Court's

32

1    view, there was no question he was the most valuable of the

2    cooperators in terms of the Government's case.  And

3    Mr. Altmanis also provided information that resulted in the

4    recovery of the bodies of the victims, which is significant.

5    That being said, the Court still has concerns regarding his

6    danger to the community once released.

7            Having considered both the sentencing factors

8    enumerated in Title 18, 3553, the Court determining that the

9    adjusted offense level is 44, Criminal History Category I, the

10   statutory minimum penalty is life without the possibility of

11   release.

12           The Court will grant the Government's motion pursuant

13   to 5K for substantial assistance.

14           The Court will follow the recommendation of the

15   Government in reference to the level reduction of six.

16           It is ordered that the Defendant shall pay to the

17   United States a special assessment of $400.

18           It is ordered that the Defendant shall pay

19   restitution pursuant to Title 18, 3663.  The amount of

20   restitution is in the sum of $710,245, payable to Mr. Tezhik.

21           And is there a separate restitution amount for

22   Mr. Umansky?

23           MR. DUGDALE:  Your Honor, it actually goes into a

24   collective fund and then we distribute it on a pro rata basis

25   depending upon the amount of ransom that was paid.  So the

33

1    Government does take care of that.

2              THE COURT:  So $710,245 is all that's requested?

3              MR. DUGDALE:  Correct.

4              THE COURT:  Restitution shall be due during the

5    period of imprisonment at the rate of not less than 25 per

6    quarter and pursuant to the Bureau of Prisons' inmate financial

7    responsibility program.  If any amount of restitution remains

8    unpaid after release from custody, nominal monthly payments of

9    at least $50 shall be made during the period of supervised

10   release.  These payments shall begin 30 days after commencement

11   of supervision.  Nominal restitution payments are ordered, as

12   the Court finds that the Defendant's economic circumstances do

13   not allow for either immediate or future payment of the amount

14   ordered.

15             The Defendant shall be held jointly and severally

16   liable with co-participants, Mr. Mikhel, Mr. Kadamovas,

17   Mr. Krylov, Ms. Solovyeva and Mr. Markovskis for the amount of

18   restitution ordered by this judgment.

19             Pursuant to Title 18, 3612(f)(3), interest is waived

20   as the Defendant does not have the ability to pay interest.

21   Payments may be subject to penalties in default and delinquency

22   pursuant to Title 18, 3612.

23             The Defendant shall comply with General Order 01-05.

24             All fines are waived.  The Court finds the Defendant

25   does not have the ability to pay the fine.

34

1          Pursuant to the <u>Sentencing Reform Act of 1984</u>, it is

2  the judgment of the Court that the Defendant, Mr. Ainar

3  Altmanis, is hereby committed on Counts One through Four of the

4  First Superseding Indictment to the custody of the Bureau of

5  Prisons to be imprisoned for a term of 280 months.  This term

6  consists of 280 months on each of Counts One through Four to be

7  served concurrently.

8          When released from imprisonment the Defendant shall

9  be placed on supervised release for a term of five years.  The

10 term consists of five years on Counts One through Four of the

11 First Superseding Information to be served concurrently under

12 the following terms and conditions:

13         The Defendant shall not commit any violation of

14 local, state or federal law.

15         The Defendant shall comply with General Order 318.

16         The Defendant shall pay the special assessment and

17 restitution in accordance with the judgment of the Court.

18         The Defendant shall comply with the immigration rules

19 and regulations and if deported from the country, either

20 voluntarily or involuntarily, not reenter the United States

21 illegally.

22         The Defendant is not required to report to the

23 Probation Office while residing outside the United States.

24 However, within 72 hours of release from any custody or any

25 reentry into the United States during the period of Court-

35

1    ordered supervision, the Defendant shall report for

2    instructions to the U.S. Probation Office located at 312 North

3    Spring Street, Room 600.

4              The Defendant shall cooperate in the collection of a

5    DNA sample.

6              As directed by the probation officer, the Defendant

7    shall apply all monies received from income tax refunds,

8    lottery winnings, inheritance, judgments and any anticipated or

9    unexpected gains to the Court-ordered obligations.

10             The Court will impose the drug testing conditions

11   mandated by statute because of the evidence elicited during the

12   course of the trial that controlled substances were used to

13   sedate certain of the victims.

14             In sentencing the Defendant, the Court has considered

15   the goals enunciated in the 5K motion made by the Government,

16   along with the sentencing factors that the Court must consider

17   under 3553.

18             In reference to the culpability of the Defendant,

19   Mr. Altmanis, in the Court's view, appears to be one of the

20   most culpable, just below Mr. Mikhel and Mr. Kadamovas.  It is

21   true that Mr. Altmanis did not participate in planning or

22   orchestrating all of the kidnappings and murders; however, he

23   was directly involved in all five kidnappings, holding hostages

24   and participating in murders of the victims.  It is also a fact

25   that he participated in physically murdering two of the

36

1   victims.   The Court believes that this sentence is necessary in

2   order to protect the public.

3           The Court must advise you of your right to appeal.

4   You have a right to appeal your sentence if you believe your

5   sentence is contrary to law or inconsistent with the Plea

6   Agreement.   It appears that the sentence is consistent with the

7   Plea Agreement and you waive your right to appeal.   However,

8   you have to decide that, Mr. Altmanis, with the advice of your

9   counsel.   If you choose to appeal your sentence, your appeal

10  must be filed within ten days from today's date.

11          That concludes --

12          **MR. DUGDALE:**   Your Honor, I'm sorry.   There's one

13  administerial matter, and that is, that the United States

14  Marshals because of Mr. Altmanis' custody status requires three

15  sealed and certified copies of the Judgment and Commitment

16  Order.   And we would request that those be made available to

17  the U.S. Marshal Service.

18          **THE COURT:**   Yes.   And that will be the order of the

19  Court.

20          And the Court, if it hasn't already been done, will

21  also by reference include into today's filings the letters

22  submitted in connection with the sentencing of the Defendant,

23  Mr. Altmanis, consisting of two pages with a January 28th, 2008

24  date.

25          Thank you very much.

37

1          **MR. DUGDALE:**  Thank you, your Honor.

2          **THE COURT:**  Are there any motions?

3          **MR. DUGDALE:**  Yes, your Honor.  The Defendant pled

4  guilty to a First Superseding Information, and the Government

5  would move to dismiss the underlying Indictment in the case.

6  Thank you.

7          **THE COURT:**  Thank you.

8          **THE CLERK:**  The Court's in recess.

9      **(This proceeding was adjourned at 2:35 p.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXCEPTIONAL REPORTING SERVICES, INC**

38

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____     February 21, 2008
        Signed                      Dated

*TONI HUDSON, TRANSCRIBER*

EXCEPTIONAL REPORTING SERVICES, INC